## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------------- X

In re:

G.I. JOE'S HOLDING CORPORATION and
G.I. JOE'S, INC.,

                                Debtors.

------------------------------------------------------------------- X

Chapter 11

Case No.: 09-10713 (KG)
Jointly Administered

**Hearing Date: February 28, 2011 at 11:00 a.m.**
**Objection Deadline: February 18, 2011 at 4:00 p.m.**

## JOINT MOTION OF THE DEBTORS AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, PURSUANT TO SECTIONS 105(a), 305(a), 349 AND 1112(b) OF THE BANKRUPTCY CODE AND RULE 9019 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE, FOR ENTRY OF AN ORDER (A) APPROVING A STIPULATION BETWEEN THE DEBTORS, THE COMMITTEE, THE PREPETITION TERM LOAN B SECURED PARTIES AND BMC GROUP, INC., (B) APPROVING PROCEDURES FOR (I) THE DISTRIBUTION OF CERTAIN FUNDS TO HOLDERS OF ALLOWED UNSECURED AND ADMINISTRATIVE EXPENSE PRIORITY CLAIMS AND (II) THE DISMISSAL OF THE DEBTORS' CHAPTER 11 CASES, AND (C) GRANTING CERTAIN RELATED RELIEF

### TO THE HONORABLE KEVIN GROSS,
### UNITED STATES BANKRUPTCY JUDGE

G.I. Joe's Holding Corporation and G.I. Joe's, Inc., as debtors and debtors-in-possession in the above-captioned chapter 11 cases (the "Debtors") and the Official Committee of Unsecured Creditors (the "Committee") hereby submit this joint motion (this "Joint Motion") requesting entry of an order, pursuant to sections 105(a), 305(a), 349 and 1112(b) of the Bankruptcy Code and Rule 9019 of the Federal Rules of Bankruptcy Procedure, (a) approving a settlement stipulation between the Debtors, the Committee, the Prepetition Term Loan B Secured Parties (defined below) and BMC Group, Inc. ("BMC") annexed hereto as **Exhibit A** (the "Settlement" or the "Settlement Stipulation"), (b) approving procedures for (i) the reconciliation, resolution and allowance of administrative expense priority and unsecured claims against the Debtors and the making of distributions to holders of such allowed claims and (ii) the dismissal

of the Debtors' chapter 11 cases (collectively, the "Distribution and Dismissal Procedures") and (c) granting certain related relief. In support of this Joint Motion, the Debtors and the Committee respectfully represent as follows:[1]

## BACKGROUND

### A.    The Chapter 11 Filings

1.      On March 4, 2009 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the District of Delaware. Pursuant to sections 1107 and 1108 of the Bankruptcy Code, the Debtors continue to manage their assets and properties as debtors-in-possession. No trustee or examiner has been appointed in these cases.

2.      On March 16, 2009, the Committee was appointed in these cases by Office of the United States Trustee for the District of Delaware (the "US Trustee"), consisting of the following seven members: (i) Raleigh America, Inc.; (ii) TRF Capital, LLC; (iii) VF Outdoor, Inc.; (iv) Columbia Sportswear USA; (v) Rocky Brands; (vi) Under Armour, Inc.; and (vii) All Sports Supply, LLC.

3.      On March 13, 2009, the Court entered that *Order Approving Agreement With BMC Group, Inc. and Appointing BMC Group, Inc. as Notice and Claims Agent for the Debtors*, pursuant to which BMC was appointed as the Debtors' claims and noticing agent (D.I. 61).

4.      Prior to the Petition Date, Crystal Capital Fund Management, L.P. (collectively with its successors, the "Term Loan B Agent") and certain other lenders party to the Prepetition Term Loan B Financing Agreements (collectively with the Term Loan B Agent, the "Prepetition Term Loan B Secured Parties") made certain tranche B term loans (the "Prepetition Term B

---

[1]      Capitalized terms not defined herein shall have the meanings ascribed to them in the Final DIP Order (defined herein).

Loans") to the Borrower pursuant to (a) the Loan and Security Agreement dated as of February 1, 2007, as amended by that certain First Amendment to Loan and Security Agreement dated as of February 7, 2007 and that certain Second Amendment and Waiver to Loan and Security Agreement dated as of March 20, 2008, each by and among the Borrower and the Term Loan B Lenders, and (b) all other agreements, documents, notes, certificates and instruments executed and/or delivered with, to, or in favor of the Term Loan B Lenders, including without limitation, all notes, mortgages, UCC financing statements, and all other related agreements, documents, notes, certificates and instruments executed and/or delivered in connection therewith or related thereto (collectively, and as the same may have been amended, supplemented and in effect from time to time, the "Prepetition Term Loan B Financing Agreements");

**B.    The Committee Resolution**

5.      On the Petition Date, the Debtors filed that (i) motion seeking authorization to, *inter alia*, obtain postpetition financing and utilize cash collateral (D.I. 13) (the "DIP Motion") and (ii) motion seeking approval of, *inter alia*, bid procedures for the sale of substantially all of the Debtors' assets (D.I. 14) (the "GOB Sale Motion").

6.      On March 17, 2009, the Committee filed an objection to the DIP and GOB Sale Motions (D.I. 84), a cross-motion for an order pursuant to sections 105(a) and 1112(b) of the Bankruptcy Code converting the Debtors' chapter 11 cases to cases under chapter 7 of the Bankruptcy Code (D.I. 84) and an emergency motion to terminate the Debtors' interim use of cash collateral (D.I. 82) (collectively, the "Committee Objections").

7.      Prior to the hearing held on March 18, 2009 (the "Final DIP Hearing") to consider the DIP Motion, the bid procedures portion of the GOB Sale Motion and the Committee Objections filed with respect thereto, the Debtors, the Committee, the Prepetition Secured Parties

and the Prepetition Term Loan B Secured Parties agreed to resolve the Committee Objections (the "Committee Resolution") on the terms and conditions approved on the record at the Final DIP Hearing and subsequently memorialized in the Order granting the DIP Motion on a modified and final basis, entered April 2, 2009 (D.I. 157) (the "Final DIP Order").

8.    The following consideration was received by the Debtors' estates as a result of the Committee Resolution:

- a seven-day extension of the GOB sale schedule proposed in the GOB Sale Motion for the purpose of providing the Debtors with additional time to pursue a sale of their business and/or assets on a going-concern basis;

- the Prepetition Secured Parties waived payment of, and released the Debtors from any obligations to pay, any Applicable Revolving Credit Prepayment Premium to which the Prepetition Secured Parties might have been entitled;

- the Prepetition Term Loan B Secured Parties agreed that ten percent (10%) of the Net Proceeds received on account of the Prepetition Term Loan B Liens less the amounts paid by the Prepetition Term Loan B Secured Parties pursuant to paragraph 10 of the Final DIP Order, would be held in escrow by counsel for the Committee for the exclusive purpose of making a distribution to prepetition general unsecured creditors (the "GUC Escrow Account");

- the DIP Lenders agreed that any amounts received as payment of the Ratification and Amendment Fees (as defined in the DIP Financing Agreements) would be paid by the DIP Lenders to counsel for the Committee and added to the GUC Escrow Account; and

- none of the Debtors, the Committee, the DIP Secured Parties, the Prepetition Secured Parties or the Prepetition Term Loan B Secured Parties would commence, or join in the prosecution of, any action under chapter 5 of the Bankruptcy Code against any Person without the prior written consent of each of the other parties.

9.    Pursuant to the Final DIP Order, the Prepetition Term Loan B Secured Parties were granted, as adequate protection to the extent of any diminution in value of their interests in the Prepetition Term Loan B Collateral (including the Cash Collateral), among other protections,

the Prepetition Term Loan B Replacement Liens, the Term Loan B Adequate Protection Payments and the Prepetition Term Loan B Superpriority Claim.

10.    Pursuant to the Final DIP Order, as part of the adequate protection provided to the Prepetition Secured Parties, the Debtors were authorized to repay the Prepetition Debt in accordance with the provisions of the Final DIP Order.  In accordance therewith, the Prepetition Secured Lenders have received indefeasible payment in full of the Prepetition Debt.

### D.    Debtors' Asset Sales

11.    On April 14, 2009, the Court entered that Order authorizing, *inter alia*, the sale of substantially all of the Debtors' assets to the joint venture (the "Joint Venture") comprised of Crystal Capital Fund Management, L.P., As Agent for Crystal Capital Fund, L.P, Crystal Capital Fund Ltd., 1903 Onshore SPV, LLC, 1903 Offshore SPV, Ltd., White Rose Fund I Mezzanine Direct, L.P. and Gordon Brothers Retail Partners, LLC, as Agent (D.I. 208) (the "GOB Sale Order"), pursuant to which the Debtors received authorization to enter into an Agency Agreement with the Joint Venture governing the conduct of store closing sales at all of the Debtors' store locations (the "GOB Sales").

12.    On or before May 31, 2009, the Joint Venture concluded all store closing sales at the Debtors' store locations and the Debtors have closed all such locations.  Thus, as of May 31, 2009, the Debtors no longer had any ongoing retail operations.

13.    On August 25, 2009, the Court entered that Order approving the sale of the Debtors' intellectual property (D.I. 451), pursuant to which the Debtors sold their interests in certain intellectual property in accordance with the terms of that Asset Purchase Agreement, dated July 24, 2009, between G.I. Joe's Inc. and G.I. Joe's Holding Corp. and UFA Holdings, Inc. (the "IP Sale" and collectively with the GOB Sales and all other dispositions of the Debtors'

assets consummated during these chapter 11 cases, the "Asset Sales"). In addition, throughout these cases, the Debtors have also collected various accounts receivable claims and monetized other miscellaneous assets of their estates.

### E.    Debtors' Current Capital Structure

14.    The proceeds of the Asset Sales, together with all other estate funds collected by the Debtors, are insufficient to satisfy all of the remaining obligations owed to the Prepetition Term Loan B Secured Parties. Specifically, the Prepetition Term Loan B Secured Parties continue to hold an unsatisfied secured claim of not less than $25 million, plus accrued but unpaid interest, fees, and expenses under the Prepetition Term Loan B Financing Agreements. The Debtors' remaining assets consist of avoidance actions and certain receivables and miscellaneous assets with a value substantially less than the outstanding claim of the Prepetition Term Loan B Secured Parties. The Debtors have no other remaining significant assets (encumbered or unencumbered) that they or the Committee can monetize in a cost-effective manner for the benefit of these estates or the Debtors' other creditors.

15.    Moreover, the Committee previously and independently assessed the value of any potential actions against the Prepetition Secured Parties and the Prepetition Term Loan B Secured Parties, among others, and determined that no viable cause of action exists. The time for the Committee to commence any such action against the Prepetition Secured Parties and the Prepetition Term Loan B Secured Parties has expired pursuant to the terms of the Final DIP Order with no such challenge having been made.

### F.    BMC Motion

16.    On January 19, 2010, BMC filed that *Application and Motion of BMC Group, Inc. for an Order (I) Allowing Administrative Expense; (II) Compelling Immediate Payment of*

*Administrative Expense; (III) Directing Debtors to Pay BMC Group, Inc.'s Future Invoices Upon Receipt or, In the Alternative, Authorizing BMC Group, Inc. Immediately to Withdraw as Notice and Claims Agent for the Debtors; (IV) Granting Relief from the Final DIP Order Pursuant to Rule 60(b) and (V) Granting Leave to BMC to Surcharge Secured Lenders' Collateral for Payment of BMC Group, Inc.'s Fees and Expenses* (D.I. 549) (the "BMC Motion"), pursuant to which BMC seeks, *inter alia*, payment of its accrued and unpaid fees and expenses since the Petition Date. The hearing to consider the BMC Motion has been continued pending the Court's adjudication of the Settlement Stipulation (which would resolve the BMC Motion if approved) and the parties have reserved all rights to prosecute or challenge the BMC Motion in the event the Settlement Stipulation is not approved and this Joint Motion is denied.

### G.  Claims Bar Dates

17.    On April 24, 2009, the Court entered that *Order Establishing Bar Dates for Filing Proofs of Prepetition Unsecured and Secured and Section 503(b)(9) Administrative Expense Claims* (D.I. 237), pursuant to which May 31, 2009 at 4:00 p.m. (prevailing Eastern Time) (the "Prepetition Claims Bar Date") was established as the deadline for all parties other than governmental units[2] to assert unsecured or secured, priority or nonpriority, prepetition claims or administrative expense claims arising under section 503(b)(9) of the Bankruptcy Code.

18.    On February 17, 2010, the Court entered that *Order Establishing Bar Date for Filing Administrative Expense Claims* (D.I. 590), pursuant to which March 15, 2010 at 4:00 p.m. (prevailing Eastern Time) (the "Postpetition Claims Bar Date" and together with the Prepetition Claims Bar Date, the "Claims Bar Dates") was established as the deadline for all parties to assert postpetition administrative expense claims against the Debtors.

---

[2]      The Prepetition Claims Bar Date Order established August 31, 2009 at 4:00 p.m. (prevailing Eastern Time) as the bar date for the filing of prepetition claims held by governmental units.

19.    As noted above, the proceeds of the Asset Sales, together with all other estate funds collected by the Debtors, were insufficient to satisfy all of the remaining Prepetition Term Loan B Debt, and the Prepetition Term Loan B Secured Parties continue to hold an unsatisfied secured claim of not less than $25 million. **Accordingly, with the exception of the funds presently held in the GUC Escrow Account and the additional funds to be transferred to the GUC Escrow Account under the Settlement—which funds are _not_ property of these estates—there are no funds available for distribution to creditors.**

20.    The Debtors' and the Committee's professionals have devoted significant time and resources to the reconciliation of outstanding claims against the Debtors both prior to and after the passage of the Claims Bar Dates. Based upon their review and analysis of the claims filed prior to the Bar Dates, the Debtors and the Committee estimate that there is approximately (i) **$70 million** in outstanding valid unsecured indebtedness chargeable to these estates and (ii) **$200,000** in outstanding valid administrative expense indebtedness chargeable to these estates (other than accrued and unpaid professional fees as discussed below).

**G.    Settlement**

21.    The Debtors, the Committee, the Prepetition Term Loan B Secured Parties and BMC have executed, subject to this Court's approval, the Settlement Stipulation which provides the following consideration to the Debtors' estates, in exchange for which the Prepetition Term Loan B Secured Parties shall receive, among other consideration provided in the Settlement Stipulation, all cash in the possession of the Debtors' estates (and all cash that comes into the possession of the Debtors' estates in the future) other than the $495,000 to be deemed transferred

to GUC Escrow Account under the Settlement, and a full and final release from any and all

obligations to the Debtors, the Committee and creditors of the Debtors' estates:[3]

- The Prepetition Term Loan B Secured Parties' release of any and all liens on and claims to any avoidance actions or the proceeds thereof.

- The transfer of $200,000 from the GUC Escrow Account (which funds would otherwise be distributed solely to unsecured creditors) to the Debtors for the purpose of making distributions to the holders of actual, allowed, but as yet unpaid, administrative priority expense claims against the Debtors (excluding estate professionals) subject to the terms, conditions and procedures concerning allowance and distribution set forth in the Approval Order (defined below).

- The transfer of $410,000 from the GUC Escrow Account (which funds would otherwise be distributed solely to unsecured creditors) to the Debtors to be added to the Carve Out for the purpose of reserving for and paying, in order of priority: (i) allowed administrative fees pursuant to 28 U.S.C. § 1930(a)(6) through the date of dismissal of the Debtors' chapter 11 cases; (ii) $149,000 to BMC in full and final satisfaction of any and all fees and expenses incurred and/or invoiced from the Petition Date through February 4, 2010; (iii) payment in full of all expenses of BMC incurred from February 5, 2010 through the date of dismissal of the Debtors' chapter 11 cases; (iv) payment of all allowed (or subsequently allowed) and unpaid fees and expenses of the Case Professionals (as defined in the Final DIP Order) incurred from the Petition Date through January 31, 2010; and (v) payment of all remaining allowed (or subsequently allowed) and unpaid fees and expenses of the Case Professionals and unpaid fees of BMC through the date of dismissal of the Debtors' chapter 11 cases, which payments shall be made by the Debtors on a *pari passu* basis among each of the Case Professionals and BMC.[4]

- The Term Loan B Agent, on behalf of and at the direction of the other Prepetition Term Loan B Secured Parties, shall waive, release and forever discharge any deficiency claim and/or any adequate protection claim of the Prepetition Term Loan B Secured Parties against the Debtors' estates solely with respect to, and solely to the extent of, the cash/consideration to be paid to or retained by the Debtors' estates pursuant to the Settlement.

---

[3]    To the extent any summaries and/or descriptions of the Settlement contained in this Joint Motion differ in any way from the terms of the Settlement Stipulation, the terms of the Settlement Stipulation shall govern.

[4]    BMC shall accept payment of all fees and expenses incurred or to be incurred in these cases consistent with the foregoing and, upon entry of the Approval Order, BMC shall be deemed to have withdrawn the BMC Motion with prejudice and waived, released and forever discharged any and all claims against the Prepetition Term Loan B Secured Parties and the Debtors' estates in respect of any fees and expenses incurred from the Petition Date through the date of dismissal of the Debtors' chapter 11 cases.

22.     The effectiveness of the Settlement Stipulation is subject in all respects to the entry of the "Approval Order", in the proposed form annexed hereto as **Exhibit B** or such other form of order as may be agreed to in writing by the Debtors, Committee, the Prepetition Term Loan B Secured Parties and BMC, which order shall, among other things, approve the Settlement, approve procedures for fixing the allowed amounts of outstanding unsecured and administrative expense claims and making distributions thereon, and provide for the dismissal of the Debtors' chapter 11 cases upon the filing of the requisite certification of counsel for the Debtors. In the absence of such order, the Settlement Stipulation shall be null and void and the parties shall be returned to their respective positions in all respects and without prejudice to their preexisting rights.

## JURISDICTION AND VENUE

23.     The Court has jurisdiction to consider this Joint Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## RELIEF REQUESTED

### A.     SETTLEMENT APPROVAL

24.     By this Joint Motion, the Debtors and Committee seek approval of the terms of the Settlement Stipulation pursuant to Bankruptcy Rule 9019(a) and section 105(a) of the Bankruptcy Code. The parties believe that if their disputes are not resolved now, future proceedings would be protracted and expensive, involve complex issues of liability and/or damages, and involve substantial uncertainties and risks inherent in litigation that could take years to resolve. The parties have thus considered the benefit to the Debtors' estates and creditors that will be received as a result of the Settlement, particularly in light of the costs,

uncertainties, delay and risks of further litigation, and have concluded that the Settlement is fair and equitable and in the best interests of the Debtors, their estates, their creditors, and all other interested parties.

### B.    PROPOSED TREATMENT OF ALLOWED ADMINISTRATIVE AND UNSECURED CLAIMS

25.    Based on their review of the Debtors' books and records, the Debtors and Committee presently estimate that a total of approximately $70 million of unsecured claims and a total of approximately $200,000[5] of administrative expense claims will be allowed at the conclusion of the Claims Resolution Process (defined below).  As noted above, with the exception of the funds held in the GUC Escrow Account and the funds to be added under the Settlement—which funds are <u>not</u> property of these estates—there are no funds available for distribution to creditors.

26.    However, if approved by the Court, the Settlement would provide for the transfer of $200,000 from the GUC Escrow Account to the Debtors for the purpose of making distributions to the holders of actual, allowed, but as yet unpaid, administrative priority expense claims against the Debtors.  In addition, approximately $730,000 would remain in the GUC Escrow Account under the Settlement, which funds will be distributed by counsel to the Committee to the holders of actual, allowed, but as yet unpaid, unsecured claims against the Debtors.  **Accordingly, the Debtors and the Committee presently estimate that, under the Settlement, holders of allowed administrative claims (other than Case Professionals and**

---

[5]    By agreement among the Debtors, the Committee and Baja, Inc., dated on or about November 3, 2010, Baja Inc.'s administrative claim will be allowed by the Debtors in the amount of (i) $30,000 <u>plus</u> (ii) any remaining balance of the $200,000 to be made available for distribution to administrative creditors under the Settlement, after accounting for payment in full of the allowed administrative claims of other creditors.  For the avoidance of doubt, <u>under no circumstances</u> will more than $200,000 be made available from GUC Escrow Account to pay the allowed claims of administrative creditors.

BMC) would receive a *pro rata* distribution of approximately <u>100%</u> of the allowed amount of their claims and holders of allowed unsecured claims would receive a *pro rata* distribution of approximately <u>1%</u> of the allowed amount of their claims.[6]

### C.    CLAIMS RESOLUTION PROCESS

27.    The Debtors and the Committee also seek approval of the following procedures governing the reconciliation, resolution and allowance of all unsecured and administrative expense priority claims asserted against the Debtors (the "Claims Resolution Process"). The proposed process, described below, will permit the distributions contemplated herein to be made to holders of allowed administrative claims and allowed unsecured claims in a manner that strikes a fair balance between the due process rights of such claimants and the economic realities of these cases.

28.    As noted above, the Claims Bar Dates have passed and the Debtors' and Committee's professionals have devoted significant time and resources to the internal reconciliation of outstanding claims against the Debtors.    Accordingly, the Debtors and Committee propose to commence the Claims Resolution Process by serving all entities who timely filed (or who were not required to file or are otherwise deemed by order of the Court to have timely filed) unsecured claims ("Potential Unsecured Claimants") or administrative expense priority claims against the Debtors ("Potential Administrative Claimants" and collectively with Potential Unsecured Claimants, "Potential Claimants") with a copy of this Joint Motion and the notice of motion filed contemporaneously herewith (the "Joint Motion Notice").    Given the enormous size of the unsecured claims pool (only a fraction of which will actually receive a distribution under the circumstances), the comparatively miniscule amount of funds available for

---

[6]    To the extent the aggregate amount of allowed administrative claims and/or allowed unsecured claims exceeds these estimates, the percentage distribution made to the holders of such allowed claims will decrease correspondingly.

distribution and the considerable costs involved in noticing a claims pool that exceeds 2,500 Potential Claimants with voluminous documents, the Debtors and Committee will not serve Potential Claimants with the exhibits to this Joint Motion, but rather will make them available electronically to any creditor or party-in-interest who submits a request to counsel for the Committee at svanaalten@cooley.com.[7]

29.     The Debtors and the Committee further propose serving all Potential Claimants with a notice, substantially in the form annexed hereto as **Exhibit C** (the "Proposed Allowed Claim Notice"), within 15 days following entry of the Approval Order, which will be served along with schedules (the "Claim Schedules") providing information concerning, among other things, the identity of Potential Claimants (and designated claim number, as applicable), the amounts of their asserted administrative expense priority and/or unsecured claims, the amounts proposed to be allowed on account of such claims and a brief explanation as to any objection to such claims or variance between the claim amounts asserted and the amounts proposed for allowance. Additionally, the Proposed Allowed Claim Notice provides instructions for filing an objection to the proposed allowed claim amount, including the date of the objection deadline and the mailing address where such objections must be sent.

30.     Because available funds are limited, these estates cannot afford an extensive claims reconciliation process. If a Potential Claimant or other interested party (a) disputes the proposed allowed amounts of their administrative expense priority and/or unsecured claim or (b) wishes to assert a claim that is not reflected on the Proposed Allowed Claim Notice, such Potential Claimant or other interested party (the "Objecting Party") shall be encouraged to contact counsel for the Debtors and/or Committee informally and attempt to resolve its claim or

---

[7]     The Joint Motion Notice advises that the Joint Motion is being served without exhibits and provides information for creditors seeking to obtain electronic copies.

objection amicably, without the need to file a formal claim or objection, as provided in the following paragraph.

31.    If an Objecting Party wishes to file a formal claim or objection, the Objecting Party will be required to file its claim objection, together with documentation supporting its claim or objection (each a "Claim Objection") with the Court on or before the deadline provided for in the Approval Order (the "Objection Deadline") and serve a copy of such Claim Objection on counsel for the Debtors and Committee, so that it is received on or before the Objection Deadline. In any Claim Objection, the Objecting Party must state the grounds for its objection clearly and with particularity.

32.    Counsel for the Debtors and the Committee will review any Claim Objections and supporting documentation timely submitted by an Objecting Party and consult with the Objecting Party in order to attempt to resolve any disputes regarding the Claim Objection. The Debtors and Committee seek authority (with each other's consent) to resolve any objection to the proposed allowed claim amounts set forth in the Proposed Allowed Claim Notice by agreement with such Potential Claimant without further order of the Court.

33.    If counsel for the Debtors or the Committee and the Objecting Party cannot agree on a resolution, then counsel for the Debtors will request that the Court conduct a hearing on the date provided for in the Approval Order to resolve any Claim Objections, so that the Debtors and the Committee are able to expeditiously process and distribute the funds in the Administrative Claim Reserve and the GUC Escrow Account. Any claim allowed pursuant to the foregoing Claims Resolution Process will be deemed either an "Allowed Administrative Claim" or "Allowed Unsecured Claim." Additionally, the Debtors and Committee hereby seek a determination from the Court that any Potential Claimant or other interested party that does not

timely file a Claim Objection be barred from challenging the proposed allowed claim amounts set forth in the Proposed Allowed Claim Notice.

34.    In order to effectuate the foregoing Claims Resolution Process, the Debtors and Committee request that the Court waive, to the extent otherwise applicable, the requirements of Rule 3007 of the Federal Rules of Bankruptcy Procedure and Local Rule 3007-1 with regard to substantive claims objections and omnibus claims objections.

**D.    DISTRIBUTIONS**

35.    Upon completion of the Claims Resolution Process, the Debtors will make the distributions to holders of Allowed Administrative Claims from the funds held in the Administrative Claim Reserve and counsel to the Committee will make the distributions to holders of Allowed Unsecured Claims from the funds held in the GUC Escrow Account. Given the minimal amount of funds available for distribution, the considerable size of the respective claims pools and the estimated distribution percentages, the Debtors and Committee respectfully request that the Court approve the following guidelines governing distributions to holders of Allowed Administrative Claims and Allowed Unsecured Claims (the "Distribution Guidelines"):

    i.    the Debtors and Committee shall be authorized to make a single distribution to creditors of the funds held in the Administrative Claim Reserve and the GUC Escrow Account;

    ii.    the Debtors and Committee shall withhold from making any distribution on account of an Allowed Administrative Claim or Allowed Unsecured Claim where such distribution would be for the amount of $50 or less;

    iii.    any distributed check that has not been claimed and/or cashed within 90 days after distribution of the check (the "Check Cashing Period") shall be deemed void and the distribution on account of such claim shall be deemed forfeited by the creditor; and

    iv.    any funds remaining in the Administrative Claim Reserve and/or the GUC Escrow Account after the expiration of the Check Cashing Period shall be remitted to the Debtors and added to the Carve Out to pay remaining allowed

15

but unpaid fees and expenses of Case Professionals and BMC in the order of priority set forth the Settlement Stipulation.

### E.    FINAL ALLOWANCE OF PROFESSIONAL FEES

36.    After all distributions to holders of Allowed Administrative Claims and Allowed Unsecured Claims are made, but before the Certification of Counsel and Request for Dismissal (defined below) is filed, the Debtors will schedule a final fee hearing and the Case Professionals will each file a final request for allowance and payment of all fees and expenses incurred during these cases.

### F.    CERTIFICATION OF COUNSEL AND REQUEST FOR DISMISSAL

37.    Finally, the Debtors and Committee request that after the Claims Resolution Process has been completed, all distributions have been made, final fee and expense applications have been adjudicated and all accrued and as yet unpaid fees owing to the Office of the United States Trustee ("UST Fees") have been paid, the Court enter an order, substantially in form annexed hereto as **Exhibit D** (the "Dismissal Order"), upon the filing of a certification of counsel and request for entry of a dismissal order, substantially in the form annexed hereto as **Exhibit E** (the "Certification of Counsel and Request for Dismissal").  The Certification of Counsel and Request for Dismissal will, among other things, (a) verify that all Claim Objections have been resolved, (b) identify the holders, claim amounts and distributions made on account of all Allowed Administrative Claims and Allowed Unsecured Claims, (c) confirm that all accrued UST Fees have been paid and (d) request entry of the Dismissal Order.

## APPLICABLE AUTHORITY

### A.    APPROVAL OF SETTLEMENT

38.    Bankruptcy Rule 9019(a) provides that "on motion by the trustee and after a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a). The

settlement of time-consuming and burdensome litigation, especially in the bankruptcy context, is encouraged and "generally favored in bankruptcy." In re World Health Alternatives, Inc., 344 B.R. 291, 296 (Bankr. D. Del. 2006); see also In re Penn Central Transportation Co., 596 F.2d 1102 (3d Cir. 1979) ("administering reorganization proceedings in an economical and practical manner it will often be wise to arrange the settlement of claims . . . ") (quoting In re Protective Committee for Independent Stockholders of TMT Ferry, Inc. v. Anderson, 390 U.S. 414, 424 (1968)).

39.    In determining the fairness and equity of a compromise in bankruptcy, the United States Court of Appeals for the Third Circuit has stated that it is important that the bankruptcy court "apprise[] itself of all facts necessary to form an intelligent and objective opinion of the probabilities of ultimate success should the claims be litigated, and estimate the complexity, expense and likely duration of such litigation, and other factors relevant to a full and fair assessment of the [claims]." In re Penn Central Transportation Co., 596 F.2d 1127, 1153 (3d Cir. 1979); see also In re Marvel Entertainment Group, Inc., 222 B.R. 243 (D. Del. 1998) (quoting In re Louise's Inc., 211 B.R. 798, 801 (D. Del. 1997) (describing "the ultimate inquiry to be whether 'the compromise is fair, reasonable, and in the interest of the estate.'")).

40.    The decision to approve a settlement "is within the sound discretion of the bankruptcy court." In re World Health Alternatives, Inc., 344 B.R. at 296; see also In re Neshaminy Office Building Assoc's, 62 B.R. 798, 803 (E.D. Pa. 1986), cited with approval in Meyers v. Martin (In re Martin), 91 F.3d 389. The bankruptcy court should not substitute its judgment for that of the parties. See In re Neshaminy Office Building Assoc's., 62 B.R. at 803. The court is not to decide the numerous questions of law or fact raised by litigation, but rather should canvass the issues to see whether the settlement falls below the lowest point in the range

17

of reasonableness.  See In re W.T. Grant and Co., 699 F.2d 599, 608 (2d Cir. 1983), cert denied, 464 U.S. 22 (1983); see also In re World Health Alternatives, Inc., 344 B.R. at 296 (stating that "the court does not have to be convinced that the settlement is the best possible compromise. Rather, the court must conclude that the settlement is within the reasonable range of litigation possibilities.") (internal citations and quotations omitted).

41.    Additionally, authorizing the Debtors to effectuate the terms of the Settlement is well within the equitable powers of this Court.  See 11 U.S.C. § 105(a) ("The court may issue any order, process or judgment that is necessary to carry out the provisions of [the Bankruptcy Code]."); see also Chinichian v. Campolongo (In re Chinichian), 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code."); In re Cooper Props. Liquidating Trust, Inc., 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) (nothing that a bankruptcy court is "one of equity and as such it has a duty to protect whatever equities a debtor may have in property for the benefit of its creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws.").

42.    The Third Circuit Court of Appeals has enumerated four factors that should be considered in determining whether a settlement should be approved.  The factors are: "(1) the probability of success in the litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of creditors."  Meyers v. Martin (In re Martin), 91 F.3d 389, 393 (3d Cir. 1996); accord Will v. Northwestern Univ. (In re Nutraquest, Inc.), 434 F.3d 639, 644 (3d Cir. 2006).  As set forth below, each of the applicable Martin factors weighs heavily in favor of

approving the Settlement pursuant to Bankruptcy Rule 9019 and section 105(a) of the Bankruptcy Code.

43.     Since the inception of these chapter 11 cases, the Debtors, the Committee, the Prepetition Term Loan B Secured Parties and BMC have been negotiating and, in some instances, litigating over the rights and obligations of the Debtors and their estates vis-à-vis the posture of these chapter 11 cases and the liens and claims of the Prepetition Term Loan B Secured Parties. Following lengthy and often contentious negotiations that took place during these chapter 11 cases, the parties ultimately agreed upon a resolution of the outstanding issues among them as embodied in the Settlement Stipulation and this Joint Motion. As the Debtors do not possess the requisite funds needed to confirm a chapter 11 plan in these cases, the settlement of these issues is the only way to avoid an unfortunate conversion of these cases to chapter 7 that would not serve the best interests of these estates and creditors.

44.     The tenuous financial position of these estates is well documented. These unfortunate economic realities have been recognized at several hearings in these cases, including the Final DIP Hearing at which time the Court approved the terms of the Committee Resolution on the record. The Committee Resolution, which resolved the Committee's objections to the DIP and GOB Sale Motions, provided for, among other things, the creation and funding of the GUC Escrow Account and a "lock-up" agreement among the parties concerning the prosecution of avoidance actions.

45.     As evidenced by the Committee's objections to the DIP and GOB Sale Motions, the GUC Escrow Account and the avoidance action lock-up agreement were products of the Committee's early concern that the Debtors would not be positioned to confirm a chapter 11 plan in these cases. This concern was justified in the months that followed the Final DIP Hearing, as

the liquidation of the Debtors' assets, together with all other estate funds collected by the Debtors, have failed not only to produce available funds for distribution to administrative and priority creditors, but are insufficient to satisfy the remaining Prepetition Term Loan B Debt.

46.    The conversion of these chapter 11 cases would result in the immediate dissolution of the Committee, the nullification of the avoidance action "lock up" agreement, the non-payment of holders of administrative claims and, perhaps most important, the appointment of a chapter 7 trustee who, having no other assets to liquidate, would almost certainly commence avoidance actions against creditors of these estates, potentially for the exclusive benefit of the Prepetition Term Loan B Lenders.

47.    In contrast, an orderly dismissal of these cases will avoid these harsh consequences and undoubtedly serve the best interests of these estates and creditors.    The Settlement Stipulation and this Joint Motion are products of the diligent and constructive efforts of the Debtors, the Committee, the Prepetition Term Loan B Secured Parties and BMC to establish the framework for an orderly dismissal that serves the best interests of all creditors under the extraordinarily difficult financial circumstances facing these estates.

48.    In view of the considerable and meaningful concessions and sacrifices made by all parties to the Settlement, there can be no question that approval of the Settlement and the structured dismissal of these chapter 11 cases will serve the best interests of these estates and creditors. Accordingly, the Debtors and the Committee respectfully submit that the Settlement is (i) fair and equitable; (ii) falls well within the range of reasonableness with respect to potential litigations that would result if the Settlement was not approved; (iii) obviates the expense, delay, inconvenience and uncertainty that would attend the litigation of these disputed issues; and (iv) advances the paramount interests of creditors by adding value, as a matter of certainty, to these

estates while simultaneously providing a critical element of finality to the Debtors' creditors who will, unfortunately, not receive substantial distributions on their claims. Therefore, the Settlement satisfies Bankruptcy Rule 9019 and should be approved by the Court.

**B.    APPROVAL OF STRUCTURED DISMISSAL**

    **i.    Dismissal of These Cases Is Warranted Under Section 1112(b) of the Bankruptcy Code**

49.    The Court should approve the Distribution and Dismissal Procedures because the Debtors (a) lack the financial ability to pay administrative creditors in full and therefore cannot satisfy the chapter 11 plan requirements of the Bankruptcy Code and (b) have no remaining unencumbered estate assets to collect and administer. For the reasons stated herein, the Debtors and the Committee submit that authorization to make the proposed distributions outside of a plan of reorganization and in the context of an orderly dismissal of these chapter 11 cases is justified and warranted under the circumstances of these cases.

50.    Under section 1112(b) of the Bankruptcy Code, a court shall "convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, **whichever is in the best interests of creditors and the estates**, if the movant establishes cause." 11 U.S.C. § 1112(b) (emphasis added); In re Albany Partners, Ltd., 749 F.2d 670, 674 (11th Cir. 1984); In re Blunt, 236 B.R. 861, 864 (Bankr. M.D. Fla. 1999). A determination of cause is made by the court on a case-by-case basis. Albany Partners, 749 F.2d at 674. The decision to dismiss or convert a case is particularly delegated to the bankruptcy court's sound discretion. See In re Camden Ordinance Mfg. Co. of Arkansas, Inc., 1999 WL 587790, at *2 (Bankr. E.D. Pa. 1999) (citing In re Atlas Supply Corp., 837 F.2d 1061, 1063 (5th Cir. 1988). Therefore, it is clear that the Court is authorized to dismiss the Debtors' chapter 11 cases upon a showing of "cause."

51.      The legislative history of section 1112(b) of the Bankruptcy Code and relevant case authority indicate that a court has wide discretion to use its equitable powers to dispose of a debtor's case.  H.R. Rep. No. 595, 95th Cong., 1st Sess. 405 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 117 (1978), reprinted in 1978 U.S.C.C.A.N. 57878; see also In re Preferred Door Co., 990 F.2d 547, 549 (10th Cir. 1993) (stating that a court has broad discretion to dismiss a bankruptcy case); In re Sullivan Cent. Plaza I, Ltd., 935 F.2d 723, 728 (5th Cir. 1991) (stating that a determination of whether cause exists under section 1112(b) of the Bankruptcy Code "rests in the sound discretion" of the bankruptcy court); In re Koerner, 800 F.2d 1358, 1367 & n.7 (5th Cir. 1986) (stating that a bankruptcy court is afforded "wide discretion" under section 1112(b) of the Bankruptcy Code); Albany Partners, 749 F.2d at 674 (same).

52.      Section 1112(b) of the Bankruptcy Code provides a nonexclusive list of 16 grounds for dismissal.  11 U.S.C. § 1112(b)(4)(A)-(P); Frieouf v. U.S., 938 F.2d 1099, 1102 (10th Cir. 1991) (stating that section 1112(b) of the Bankruptcy Code's list is nonexhaustive); In re Blunt, 236 B.R. at 864 (same).  One such ground is where a party-in-interest shows that there is an "inability to effectuate a plan [of reorganization]."[8]  11 U.S.C. § 1112(b)(2)(A); Preferred Door Co., 990 F.2d at 549; Sullivan Cent. Plaza I, 935 F.2d at 728.  Inability to effectuate a plan arises when a debtor lacks the capacity to "formulate a plan or carry one out" or where the "core" for a workable plan of reorganization "does not exist."  See Preferred Door, 990 F.2d at 549 (quoting Hall v. Vance, 887 F.2d 1041, 1044 (10th Cir. 1989)) (finding an inability to effectuate a plan arises where debtor lacks capacity to formulate a plan or carry one out); In re Blunt, 236 B.R. at 865 (finding cause to dismiss debtor's case under section 1112(b)(2) of the Bankruptcy Code where "core" for a workable plan of reorganization found to be nonexistent).  Accordingly,

---

[8]      In addition to the Debtors, the Committee is a party-in-interest in the Debtors' chapter 11 cases.  11 U.S.C. § 1109(b); In re Piper Aircraft Corp., 244 F.2d 1289, 1303 n.11 (11th Cir. 2001) (finding that a creditors' committee is a party in interest in a chapter 11 bankruptcy proceeding).

the Court may dismiss the Debtors' chapter 11 cases because the Debtors are unable to effectuate a plan.

53.    Here, it is simply not possible for the Debtors to confirm a chapter 11 plan because the Debtors have liquidated all of their assets, have no unencumbered funds and cannot pay administrative expense claims in full from estate funds. All of the Debtors' inventory has been sold and the Debtors are no longer operating any retail stores. As such, there is no business to reorganize and there are insufficient funds to confirm a plan of liquidation. By continuing in bankruptcy, the Debtors would likely incur additional administrative expenses beyond their ability to pay. In sum, the Debtors have met their burden of proof to show that cause exists to dismiss these chapter 11 cases under section 1112(b) of the Bankruptcy Code due to their inability to effectuate a plan of reorganization.

54.    Once a court determines that cause exists to dismiss a chapter 11 case, the court must also evaluate whether dismissal is in the best interests of the estate and creditors. See In re Superior Sliding & Window, Inc., 14 F.3d 240, 243 (4th Cir. 1994); In re Mazzocone, 183 B.R. 402, 411 (Bankr. E.D. Pa. 1995), aff'd 200 B.R. 568 (E.D. Pa. 1996); In re Warner, 83 B.R. 807, 809 (Bankr. M.D. Fla. 1988). A variety of factors demonstrates that it is in the best interests of the Debtors' estates and creditors to dismiss these chapter 11 cases and authorize the Distribution and Dismissal Procedures sought herein.

55.    A dismissal of the Debtors' chapter 11 cases meets the best interests of creditors test where a debtor has nothing left to reorganize and the debtor's assets are fixed and liquidated. See In re BTS, Inc., 247 B.R. 301, 310 (Bankr. N.D. Okla. 2000); In re Camden Ordinance Mfg. Co. of Arkansas, Inc., 245 B.R. 794, 799 (E.D. Pa. 2000) (finding that a reorganization to salvage a business which ceased doing business was not feasible); In re Brogdon Inv. Co., 22

B.R. 546, 549 (Bankr. N.D. Ga. 1982) (dismissing chapter 11 case in part where there was "simply nothing to reorganize" and no reason to continue the reorganization). As noted above, the Debtors have nothing left to reorganize, as virtually all of the Debtors' assets have been liquidated. The only significant remaining task is for the parties to effectuate the Settlement and distribute the funds to the Debtors' remaining administrative creditors.

56.      Additionally, dismissal of these chapter 11 cases is warranted because the alternative—conversion to chapter 7—would not serve the best interests of the Debtors' estates and creditors for the reasons discussed above. One element of the best interests tests focuses upon whether the economic value of the estate is greater inside or outside of bankruptcy. In re Clark, 1995 WL 495951, at 5 (N.D. Ill. 1995); In re Staff Inv. Co., 146 B.R. 256, 261 (Bankr. E.D. Cal. 1993). The prime criterion for assessing the best interests of the estate is the maximization of value as an economic enterprise. See id. Here, the Settlement and the proposed Distribution and Dismissal Procedures will maximize the value of the Debtors' estates because conversion to chapter 7 would impose substantial and unnecessary additional administrative costs upon the Debtors' estates with no guarantee that these estates and creditors would receive more consideration than provided under the Settlement.

57.      Numerous courts, both in this district and throughout the country, have approved orderly dismissals under similar circumstances to the Debtors' cases, where the debtor lacks the requisite financial ability to confirm a chapter 11 plan and/or where the costs associated with plan confirmation would eliminate the possibility of a meaningful creditor recovery. See, e.g., In re KB Toys, Inc., Case No. 08-13269, D.I. 914 (Bankr. D. Del. 2009); In re CFM U.S. Corporation, et. al., Case No. 08-10668, D.I. 1097 (Bankr. D. Del. 2009); In re Wickes Holdings, LLC, et al., Case No. 08-10212, D.I. 1418 (Bankr. D. Del. 2009); In re Bag

Liquidation, Ltd, Case No. 08-32096, D.I. 688 (Bankr. N.D. Tex. 2009); In re Levitz Home

Furnishings, Inc., Case. No. 05-45189, D.I. 1167 (Bankr. S.D.N.Y. 2008); In re Princeton Ski

Shop, Inc., et al, Case No. 07-26206, D.I. 546 (Bankr. D.N.J. 2008); In re Harvey Elecs., Inc.,

Case No. 07-14051, D.I. 177 (Bankr. S.D.N.Y. 2008); In re Dawahare's of Lexington, LLC,

Case No. 08-51381, D.I. 316 (Bankr. E.D. Ky 2008); In re Scient, Inc., et al., Case No. 02-

13455, D.I. 821 (Bankr. S.D.N.Y. 2006); In re CSI, Inc., et al., Case No. 01-12923, D.I. 284

(Bankr. S.D.N.Y. 2006); In re New Weathervane Retail Corp., 04-116349, D.I. 566 (Bankr. D.

Del. 2005); In re Blades Board & Skate, LLC, Case No. 03-48818, D.I. 126 (Bankr. D.N.J.

2004).

      **ii.**    **Dismissal of These Cases Is Warranted Under Section**
               **305(a)(1) of the Bankruptcy Code**

58.    Alternatively, cause exists to dismiss these chapter 11 cases pursuant to section

305(a) of the Bankruptcy Code, which provides, in pertinent part:

> (a)    The court, after notice and a hearing, may dismiss a case under this title, or may suspend all proceedings in a case under this title, at any time if—
>
> > (1)    the interests of creditors and the debtor would be better served by such dismissal or suspension;

11 U.S.C. § 305(a).

59.    In applying section 305(a), courts have considered a wide range of factors,

including, but not limited to:

> (i)    economy and efficiency of administration;
>
> (ii)    whether federal proceedings are necessary to reach a just and equitable solution;
>
> (iii)    whether there is an alternative means of achieving an equitable distribution of assets; and
>
> (iv)    whether the debtor and the creditors are able to work out a less expensive out-of- court arrangement which better serves the interests in the case.

See In re Crown Village Farm, LLC, Case No. 09-11522 (KG), U.S. Bankr. LEXIS at *24 (Bankr. D. Del. June 12, 2009) (enumerating 305(a) factors and denying motion only because dismissal or abstention would have a deleterious effect on the administration of the debtor's chapter 11 case "which would languish while core issues were tried elsewhere"); see also In re Mazzocone, 200 B.R. 568, 575 (E.D. Pa. 1996). However, "the exact factors to be considered and the weight to be given to each of them is highly sensitive to the facts of each individual case." Mazzocone, 200 B.R. at 575.

60.     Dismissal of these cases is warranted under section 305(a)(1) for the same reasons that "cause" exists to dismiss these cases pursuant to section 1112(b)—approval of the Settlement and dismissal of the cases will effectuate an efficient administration of these estates and represents the least expensive and most equitable alternative for the distribution assets. Indeed, courts across the country have approved structured dismissals similar to that proposed by the instant Joint Motion under section 305(a) of the Bankruptcy Code. See, e.g., In re Scient, Inc., et al., Case No. 02-13455 (AJG), D.I. 821 (Bankr. S.D.N.Y. 2006); In re CSI, Inc., et al., Case No. 01-12923 (REG), D.I. 284 (Bankr. S.D.N.Y. 2006).

61.     The Settlement and the Distribution and Dismissal Procedures represent the parties' negotiated resolution of these chapter 11 cases. Authorizing the distributions contemplated herein and allowing the dismissal of these chapter 11 cases furthers the efficient administration of the Debtors' estates and maximizes value for creditors.

## NOTICE

62.     Notice of this Joint Motion will be given to (a) the United States Trustee for the District of Delaware, (b) counsel to the Prepetition Secured Parties and (c) the Potential

Claimants.  The Debtors and Committee respectfully submit that no other or further notice is required.

## NO PRIOR REQUEST

63.    No prior request for the relief sought in this Joint Motion has been made to this or any other Court.

**WHEREFORE,** the Debtors and the Committee respectfully request that the Court enter an order, substantially in the form annexed hereto as Exhibit B, (a) approving the Settlement, (b) approving the Distribution and Dismissal Procedures, and (c) granting such other and further relief as the Court deems just and proper.

PAC 999630v.1

Dated:  February 4, 2011
   Wilmington, Delaware

**POTTER ANDERSON & CORROON LLP**  **BALLARD SPAHR LLP**


*/s/ Steven M. Yoder*           */s. Leslie C. Heilman*
Steven M. Yoder (No. 3885)      Tobey M. Daluz (No. 3939)
Etta R. Wolfe (No. 4164)       Leslie C. Heilman (No. 4716)
Hercules Plaza, Sixth Floor      Joshua E. Zugerman (No. 5261)
1313 N. Market Street        919 N. Market Street, 11th Floor
P.O. Box 951           Wilmington, DE 19801
Wilmington, DE 19899-0951     Telephone:  (302) 252-4465
Telephone:  (302) 984-6000     Facsimile:  (302) 252-4466
Facsimile:  (302) 658-1192


-and-               -and-


**PROSKAUER ROSE LLP**       **COOLEY LLP**
Mark K. Thomas         Lawrence C. Gottlieb (LG 2565)
Paul V. Possinger        Jay R. Indyke (JI 0353)
Three First National Plaza      Seth Van Aalten (SV 2663)
70 West Madison, Suite 3800     1114 Avenue of the Americas
Chicago, Illinois 60602       New York, New York 01136
Telephone: (312) 962-3550     Telephone: (212) 479-6000
Facsimile: (312) 962-3551      Facsimile: (212) 479-6275


-and-             *Counsel for the Official Committee of*
                *Unsecured Creditors*


**PROSKAUER ROSE LLP**
Richard J. Corbi
1585 Broadway
New York, New York 10036
Telephone:  (212) 969-3000
Facsimile: (212) 969-2900


*Counsel for Debtors and*
*Debtors-in-Possession*